# UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS

## UNITED STATES

### v.

## Kathleen E. RICHARD
## Yeoman Second Class (E-5), U.S. Coast Guard

## CGCMG 0391
## Docket No. 1484

## 05 March 2024

General court-martial sentence adjudged on 08 February 2022.

| | |
|---|---|
| Military Judge: | CDR Paul R. Casey, USCG |
| | CDR Justin R. McEwen, USN |
| Appellate Defense Counsel: | LCDR Kristen R. Bradley, USCG (argued) |
| | LT Schuyler B. Millham, USCG |
| Appellate Government Counsel: | LCDR Daniel P. Halsig, USCG |
| | LT Elizabeth M. Ulan, USCG (argued) |
| | LT Christopher J. Hamersky, USCG |

## BEFORE
## McCLELLAND, JUDGE & BRUBAKER
Appellate Military Judges

BRUBAKER, Judge:

A general court-martial of members with enlisted representation convicted Appellant, contrary to her pleas, of one specification of involuntary manslaughter of a child, in violation of Article 119, Uniform Code of Military Justice (UCMJ). Appellant was sentenced to confinement for six years, a dishonorable discharge, and reduction to E-1. Judgment was entered accordingly.

We conclude that the specification failed to provide adequate notice of the act(s) or omission(s) on which the involuntary manslaughter conviction was based and that this error was

not harmless beyond a reasonable doubt. Accordingly, we reverse and do not reach Appellant's remaining assignments of error.[1]

## Background

After finding their five-month-old daughter, SFG, in her crib cold and unresponsive, Appellant and her then-husband rushed her to a nearby emergency room. Life-saving measures failed to revive SFG, and she was pronounced deceased. After conducting an autopsy, a medical examiner concluded the cause of death was "consistent with asphyxia due to the prone position of the infant in the bedding" as well as the swaddling of the infant. R. at 3148. She also found bruises on the back of SFG's head, but concluded that the manner of death was "undetermined" because "the infant may have been accidentally placed face down, might have gotten in trouble

---

[1] Appellant raises a total of twelve assignments of error (AOEs):

  I.    Whether Coast Guard Investigative Service (CGIS) agents unlawfully influenced Appellant's court-martial by tampering with a material alibi witness to the point that she could no longer remember what she heard;

  II.   Whether the trial counsel committed prosecutorial misconduct by, inter alia, condoning the CGIS agents' unlawful tampering with a material alibi witness, arguing what the witness would have said if called to testify in violation of the military judge's prior ruling, and twice presenting inadmissible evidence;

  III.  Whether the military judge erred by instructing the members to disregard unobjected-to hearsay evidence that the baby was heard "cooing" during the time the Government argued she was dead;

  IV.   Whether CGIS agents obtained admissions from Appellant through violation of Article 31(b), UCMJ, psychological coercion, and unlawful inducement;

  V.    Whether the specification of unpremeditated murder under Article 118 (and consequently the lesser-included offense of involuntary manslaughter under Article 119) is fatally defective by failing to allege any act or omission by Appellant that caused the child's death;

  VI.   Whether the military judge erred by failing to instruct the members they had to find the child's death resulted from a specific (culpably negligent) act or omission by Appellant in order to convict her of involuntary manslaughter under Article 119;

  VII.  Whether the failure of the specification to state an offense and the military judge's erroneous instruction on the lesser-included offense failed to correct this defect such that it resulted in an ambiguous verdict which precludes this Court from conducting a factual sufficiency review;

  VIII. Whether the military judge abused his discretion by admitting evidence under M.R.E. 404(b) for purposes not relevant to the charged offense of unpremeditated murder and then also allowing it to be considered on the lesser-included offense of involuntary manslaughter;

  IX.   Whether the cumulative effect of the errors in this case is so great that Appellant was denied her due process right to a fair trial;

  X.    Whether the evidence is factually sufficient to support a conviction for involuntary manslaughter where no specific act or omission by Appellant was alleged and the Government failed to produce evidence that each possible act was culpably negligent;

  XI.   Whether Appellant was denied her constitutional right to a unanimous verdict;

  XII.  Whether the convening authorities violated Appellant's equal protection rights when they solicited and presumptively considered panel members' race and gender in selecting who would serve on Appellant's court-martial (granted as a supplemental AOE).

We heard oral argument on AOEs I, V, VI, and VII.

by getting caught in the area of the blankets, basically just running out of air . . . . Or there could be even an act of pressure on the infant." R. at 3149–50.

After further investigation, including multiple interrogations of Appellant, the Government charged Appellant with two specifications of murder under Article 118, UCMJ, and one specification of obstructing justice under Article 131b. The first murder specification alleged Appellant did "with an intent to kill or inflict great bodily harm, murder [SFG], a child under the age of 16 years, by asphyxia." Charge Sheet. The second murder specification alleged Appellant did "with knowledge that death or great bodily harm was a probable consequence, murder [SFG], a child under the age of 16 years, while engaging in an act which is inherently dangerous to another and evinces a wanton disregard of human life, to wit: by asphyxia." Charge Sheet.

Trial defense counsel moved to dismiss both murder specifications, asserting they failed to allege a specific act or omission by Appellant that resulted in SFG's death. The military judge denied the motion.

At trial, the military judge instructed the members that involuntary manslaughter was a lesser included offense of the intentional murder specification and required proof "that [SFG's] death resulted from the act of the accused by asphyxia." R. at 3959. The members found Appellant: not guilty of murder with intent to kill or inflict great bodily harm, but guilty of the lesser included offense of involuntary manslaughter; not guilty of murder while engaging in an act which is inherently dangerous to another; and not guilty of obstructing justice.

## Law

Whether a specification states an offense is a question of law that we review de novo. *United States v. Crafter*, 64 M.J. 209, 211 (C.A.A.F. 2006). To protect an accused's Fifth and Sixth Amendment rights, a specification must: (1) allege, either expressly or by necessary implication, every element of the offense intended to be charged and "sufficiently apprise[] the [accused] of what he must be prepared to meet"; and (2) protect him against double jeopardy. *Russell v. United States*, 369 U.S. 749, 763–64 (1962) (quoting *Cochran and Sayre v. United States*, 157 U.S. 286, 290 (1895)); *United States v. Turner*, 79 M.J. 401, 403 (C.A.A.F. 2020).

3

"The lens through which this Court evaluates the sufficiency of a specification differs depending on when counsel first raised the issue." *Turner*, 79 M.J. at 403. When, as here, counsel challenged the specification at trial, "we read the wording narrowly and will only adopt interpretations that hew closely to the plain text." *Id*. (quoting *United States v. Fosler*, 70 M.J. 225, 230 (C.A.A.F. 2011)) (ellipsis omitted).

"If a specification fails to state an offense, the appropriate remedy is dismissal of that specification unless the Government can demonstrate that this constitutional error was harmless beyond a reasonable doubt." *Id*. To determine harmlessness, "we look to the record to determine whether notice of the missing element is somewhere extant in the trial record, or whether the element is 'essentially uncontroverted.' " *United States v. Humphries*, 71 M.J. 209, 215–16 (C.A.A.F. 2012) (quoting *United States v. Cotton,* 535 U.S. 625, 633 (2002)).

## Analysis

1. *The Specification Failed to Provide Notice of Involuntary Manslaughter*

To place Appellant on notice that she could be convicted of involuntary manslaughter of a child, the following elements had to be "necessarily included" as a subset of the elements alleged in the murder specification: (1) that a certain person is dead; (2) that the death resulted from the act or omission of the accused; (3) that the killing was unlawful; (4) that this act or omission of the accused constituted culpable negligence; and (5) that the person killed was a child under the age of 16 years. *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), para. 57.b.(2) at IV-78–79; *United States v. Riggins*, 75 M.J. 78, 82 (C.A.A.F. 2016) (quoting Art. 79, UCMJ).

The specification alleges that Appellant murdered SFG "by asphyxia" without further identifying an act or omission. Charge Sheet. Appellant asserts this deprived her of constitutionally required notice of what the alleged act or omission was that resulted in SFG's death by asphyxia. Reading the specification narrowly and hewing closely to its plain text, we agree.

"By asphyxia" describes a medical cause of death, not what act or omission brought about that cause of death. "Asphyxia" is defined as "a lack of oxygen or excess of carbon dioxide in the body that results in unconsciousness and often death and is usually caused by interruption of breathing or inadequate oxygen supply." Merriam-Webster's Online Dictionary, www.merriam-webster.com/dictionary/asphyxia, last visited 26 January 2024. As the Government's own experts in this case attested, "asphyxia" is a broad term that can have a wide variety of causal factors from carbon monoxide poisoning to an infant's accidental suffocation in an unsafe sleep environment, to intentional strangulation. Like death by exsanguination (massive loss of blood), for instance, death by asphyxia describes how a person died, not what, if any, act or omission by another human actor may have brought that about.

Both the *MCM* and the Military Judges' Benchbook urge more precision than this. The *MCM*'s sample specification for the charged offense of murder reads, in relevant part, that the accused did "murder _____ by means of (shooting (him) (her) with a rifle (_____))." *MCM*, para. 56.e at IV-78. The shortcoming of the specification charged is not that charging authorities omitted the words "by means of." It is that they missed the point: the model specification calls for alleging that the accused murdered someone by *doing a specific thing*—like "by means of shooting him with a rifle," not by means of a cause of death like asphyxia or exsanguination. In the same vein, the Military Judges' Benchbook advises instructing that the "death resulted from the (act) (omission) of the accused in (*state the act or failure to act alleged*)."[2] Together, these should act as guideposts to charging authorities not just to charge that *some* act or omission resulted in a certain cause of death, but to state *what* that act or omission was.

Below, trial counsel conceded that asphyxia "clearly may result from a wide array of actions or circumstances that may or may not involve another person." App. Ex. 63 at 2. But both below and on appeal, the Government contends that read as a whole, the specification alleges, by necessary implication if not expressly, that Appellant committed an act or omission that caused SFG's death by asphyxia. We do not question that the specification alleges that Appellant committed *an* act or omission that resulted in death by asphyxia. But it does not allege

---

[2] Dep't of the Army Pam. 27-9, Legal Services: Military Judges' Benchbook para. 3-43-2 (Feb. 29, 2020) (emphasis added).

what that act or omission was, and as the Supreme Court has made clear, merely reciting an element without alleging central facts or circumstances can still deprive an accused of constitutionally required notice.

In *Russell v. United States*, the Court was confronted with indictments alleging refusal to answer questions before a congressional subcommittee in violation of 2 U.S.C. § 192. 369 U.S. at 751–52. The indictments averred, in general terms, that the questions the defendants refused to answer "were pertinent to the question then under inquiry" by the subcommittee—an element of the offense—but failed to identify what that question then under inquiry was. *Id*. at 752.

The Court reiterated the two criteria by which the sufficiency of an indictment is measured: (1) "whether the indictment contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet"; and (2) "in case any other proceedings are taken against him for a similar offense whether the record shows with accuracy to what extent he may plead a former acquittal or conviction." *Id*. at 765–66 (cleaned up). Despite the indictments at issue using statutory language to list each element of the offense and protecting the defendants against double jeopardy, the Court nonetheless concluded the indictments were inadequate because they "failed to sufficiently apprise the defendant of what he must be prepared to meet." *Id*. at 764 (cleaned up). It explained:

> [T]he very core of criminality under 2 U.S.C. § 192 is pertinency to the subject under inquiry of the questions which the defendant refused to answer. What the subject actually was, therefore, is central to every prosecution under the statute. *Where guilt depends so crucially upon such a specific identification of fact, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute*.

*Id*. (emphasis added).

The Court stated that mere recitation of a statute's elements is insufficient unless they "apprise the defendant 'with reasonable certainty, of the nature of the accusation against him.' " *Id*. at 765 (quoting *United States v. Simmons*, 96 U.S. 360, 362 (1877)). "Undoubtedly, the language of a statute may be used in the general description of an offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of

the specific offense, coming under the general description, with which he is charged." *Id.* (quoting *United States v. Hess*, 124 U.S. 483, 487 (1888)). Despite its citation to older cases, the Court emphasized that "these basic principles of fundamental fairness retain their full vitality under modern concepts of pleading . . . ." *Id.* at 765–66.

When, rather than descending to particulars, an indictment remains "cryptic," it "requires the defendant to go to trial with the chief issue undefined. It enables his conviction to rest on one point and the affirmance of the conviction to rest on another. It gives the prosecution free hand on appeal to fill in the gaps of proof by surmise or conjecture." *Id.* at 766.

On this latter point, the Court instructs that an "important corollary purpose" of the requirement to set out such facts and circumstances is to inform an appellate court "of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had." *Id.* at 768 (quoting *United States v. Cruikshank*, 92 U.S. 542, 558 (1875)). "Viewed in this context, the rule is designed not alone for the protection of the defendant, but for the benefit of the prosecution as well, by making it possible for courts called upon to pass on the validity of convictions under the statute to bring an enlightened judgment to that task." *Id.* at 769.

For the offense of involuntary manslaughter, it can scarcely be disputed that what an accused actually did or failed to do that resulted in the death of another is at the core of any prosecution. *See MCM*, para. 57.b.(2) at IV-78. Accordingly, to provide adequate notice of the offense of involuntary manslaughter, a specification reciting the elements of the offense must "be accompanied with such a statement of the facts and circumstances as will inform the accused"— and appellate courts—of *what act or omission* by the accused was culpably negligent and caused the death of another. *Russell*, 369 U.S. at 765.

The Government points to two State court cases that it says supports that alleging murder "by asphyxia" is adequate. *See Moulton v. State*, 395 S.W.3d 804, 806 (Tex. Crim. App. 2013); *State v. Cobb*, 251 Conn. 285, 383–84, 743 A.2d 1, 62 (1999). But these cases have limited persuasive value. Besides being about jury instructions and State procedural rules, respectively—

not about the right to notice in charging documents under the U.S. Constitution—they address convictions for the charged offense of intentional murder. Here, we address not whether alleging intentional murder by asphyxia is sufficient to sustain a murder conviction, but whether it is sufficient to place an accused on notice of the offense of involuntary manslaughter as a lesser included offense. Rather than requiring an intentional act to deprive another of oxygen, this requires merely a culpably negligent act or omission having that effect. For an accused, counsel, fact-finders, and appellate courts alike, that opens the aperture of potential acts or omissions significantly.

We hold that read narrowly and hewing closely to its plain text, the specification fails to allege what culpably negligent act or omission of Appellant's resulted in SFG's death by asphyxia. This deprived her of constitutionally required notice of what she had to be prepared to meet at trial and, as we will explain further below, frustrates our ability to weigh the sufficiency of the evidence.

2. *The Specification's Inadequate Notice is not Harmless Beyond a Reasonable Doubt*

We conclude this error was not harmless beyond a reasonable doubt for two reasons: (1) nothing in the record provides Appellant adequate notice of what act(s) or omission(s) she was defending against; and (2) nothing in the record informs us of what act(s) or omission(s) the members based their verdict on. Based on this, we are unable to conduct our review under Article 66, UCMJ, and cannot conclude beyond a reasonable doubt that, absent the error, the outcome would have been the same.

As potential sources of notice in the record, the Government points to trial defense counsel's statements in pretrial litigation, where they discussed possible acts or omissions the Government might be alleging, and trial counsel's opening and closing statements, where they consistently argued that Appellant asphyxiated SFG by the specific act of pressing her head into the mattress of the crib. Neither of these, however, cured the lack of notice.

Appellant's mention of potential alleged acts or omissions was in the context of a motion for a bill of particulars. The examples were not exhaustive. The point was that without a bill of

particulars, Appellant was being forced to prepare for trial without knowing what specifically the Government alleged she did or failed to do and that unless the Government was confined to specific act(s) or omission(s), she would be subject to unfair surprise at trial. The discovery provided to her pointed to any number of possible alleged acts or omissions leading to SFG's death, some that would survive review for legal and factual sufficiency and some that would not.

As it did throughout the trial, the Government responded by refusing to confine itself to any particular act(s) or omission(s). It stated that Appellant's "request to know the specific act that led to [SFG's death] . . . is really a request to limit the government to one and only one factual theory." App. Ex. 23 at 2. It reasoned that, having charged Appellant with causing death by asphyxia, it was free to present evidence of multiple uncharged acts or omissions that could have caused asphyxia, and, under the general verdict theory, the members could pick which provided the basis for a conviction.

The military judge agreed and denied the motion for a bill of particulars. As discussed above, we disagree that the Government was entitled to a free hand on what act(s) or omission(s) may have been culpably negligent and caused death by asphyxia. It could have given notice of more than one act or omission that, in combination, allegedly resulted in death, but by refusing to confine itself to *any* particular act(s) or omission(s), it, in essence, blocked potential cures to the lack of notice.

During the presentation of evidence, the Government was therefore unconstrained as to what act(s) or omission(s) could provide the basis for an involuntary manslaughter conviction. In fact, both parties presented evidence supporting a range of other possible acts or omissions that the members could conclude negligently caused SFG's death, including placing her in the crib face down with a pacifier in her mouth, having other bedding in the crib, leaving a bib on her, swaddling her tightly, applying pressure to her, or any combination thereof. The fact that *trial defense counsel* presented some of this evidence to rebut the Government's theory of intentional murder by pressing the head down only compounds the problem: without knowing what act(s) or omission(s) the members found negligently (rather than intentionally) caused death, we cannot discount the possibility that trial defense counsel unwittingly helped the Government provide a

basis for the involuntary manslaughter conviction. This by itself demonstrates prejudice resulting from the lack of notice.

Following the presentation of evidence, Appellant again moved to dismiss the specification. The Government again resisted being confined to any particular act(s) or omission(s):

> We are just circling the same issue that [has] already been litigated extensively in motions practice. We believe the act is causing asphyxiation. That is the act. And that there is no requirement to plead a detailed chain of events of how you cause asphyxiation. That's what the facts of the case are about. And it can be, like in any case, not just a single thing that a person does, right, but a combination of things. We believe that is the facts here. All of the things, in combination with each other, swaddling, putting the pacifier in, placing in the bed in that position, pressing on the back of the head, all of those things are the combined acts, if you will, that caused asphyxiation. That's . . . been our theory all along.

R. at 3599.

Nor did the instructions confine the Government to any particular act(s) or omission(s). Over Appellant's objection, the military judge instructed that to convict Appellant of the lesser included offense of involuntary manslaughter, they must be convinced beyond a reasonable doubt that SFG's "death resulted from the act of the accused by asphyxia . . . ." R. at 3959. He declined a tailored instruction defining the act as the use of physical force to press SFG's head into the mattress to cause her to stop breathing, and instead explained: "To cause asphyxia means to kill or make unconscious through want of adequate oxygen or other obstruction to normal breathing." *Id*. This reflected what was alleged in the specification, but did nothing to cure the failure to allege *what* Appellant negligently did or failed to do to cause asphyxia, whether singularly or in combination. The members retained a free hand on that crucial question, as the Government had during presentation of evidence.

Without knowing what act(s) or omission(s) the members based their verdict on, we cannot bring "an enlightened judgment" to whether their verdict is supported by legally and factually sufficient evidence. *Russell*, 369 U.S. at 769; Art. 66, UCMJ. Their verdict—acquitting Appellant of the charged offense of murder but convicting her for doing or failing to do

*something* that was culpably negligent and resulted in death by asphyxia—combined with the wide-ranging evidence presented at trial leaves us guessing as to what act(s) or omission(s) they based their verdict on. It is certainly *possible* they found that Appellant caused asphyxia by pressing SFG's head into the mattress as the Government propounded—just with culpable negligence rather than an intent to kill. There was evidence to support that. However, "that the evidence of [this] may have been legally sufficient to prove [that Appellant committed this particular act] does not answer the altogether different question whether Appellant suffered material prejudice to [her] substantial right to notice and to defend [her]self." *United States v. Gaskins*, 72 M.J. 225, 232 (C.A.A.F. 2013).

Also possible is that the members rejected the pressed-head-into-mattress theory along with the intentional-murder theory and based their finding of culpable negligence instead on some other act(s) or omission(s). The error cannot be harmless beyond a reasonable doubt when we are unable to reliably determine what act(s) or omission(s) the members relied on. To review for sufficiency of the evidence, we would need to be satisfied that the evidence supports that "the death resulted from the act or omission" of Appellant and that "*this* act or omission . . . constituted culpable negligence." *MCM*, para. 57.b.(2)(b), (d) at IV-79 (emphasis added). Without knowing what "this" act or omission was, we cannot fulfill our statutory duty.

Finally, we cannot conclude beyond a reasonable doubt that had the Government properly alleged involuntary manslaughter, the outcome would have been the same: confined to particular act(s) or omission(s), the members might have acquitted altogether. *Cf. Turner*, 79 M.J. at 407–08.

Accordingly, we conclude that the specification's failure to adequately allege an act or omission is not harmless beyond a reasonable doubt.

## Decision

The finding of guilty to Specification 1, Charge I, is set aside and the specification is dismissed. A rehearing is authorized.

Chief Judge McCLELLAND and Judge JUDGE concur.



For the Court,


Sarah P. Valdes
Clerk of the Court